**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RAUL TIJERINA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 14 C 343 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| JACQUELINE LASHBROOK,[1] | ) | |
| | ) | |
| Respondent. | ) | |

**OPINION AND ORDER**

Petitioner Raul Tijerina, who is currently incarcerated at Menard Correctional Center, is serving a sixty-year sentence for first degree murder and a consecutive forty-year sentence for intentional homicide of an unborn child. Tijerina has petitioned this Court for a writ of habeas corpus under 28 U.S.C. § 2254, alleging that the prosecutor's comments during rebuttal argument deprived him of a fair trial and that he received ineffective assistance of counsel because his trial counsel failed to argue for suppression of his post-arrest statements based on his alleged invocation of the right to counsel. Because Tijerina has not shown that the state court's decisions on these issues were contrary to or an unreasonable application of clearly established federal law, the Court denies Tijerina's petition and declines to issue a certificate of appealability.

**BACKGROUND**

The state court's factual findings are presumed to be correct for the purposes of habeas review, as Tijerina has not presented clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Schriro v. Landrigan*, 550 U.S. 465, 473–74, 127 S. Ct. 1933, 167 L. Ed. 2d

---

[1] Jacqueline Lashbrook is presently the warden at Menard Correctional Center and is substituted as the proper Respondent in this matter. *See* Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts.

836 (2007); *McManus v. Neal*, 779 F.3d 634, 649 (7th Cir. 2015). The Court begins by summarizing the following facts relevant to Tijerina's petition, as drawn from the state court record.

## I. Pretrial Proceedings

On July 9, 2000, Sonya Garcia, who was fourteen years old and visibly pregnant, was found dead in the apartment she shared with Tijerina. Tijerina was arrested on June 4, 2004 in Texas by Chicago police detective Richard Milz, who was accompanied by three other Chicago police officers and Cook County Assistant State's Attorney Lou Longhitano. After his arrest, Tijerina was taken to the courthouse in Dimmit County, Texas, where in three separate interviews, he confessed to hitting, biting, and choking Garcia. The third statement was videotaped. When the officers and Longhitano returned to Chicago, they learned that the video had failed to record sound. They then returned to Texas on June 17, 2004 to obtain another videotaped statement from Tijerina. Before providing both the June 4 and June 17 videotaped statements, Tijerina signed forms consenting to the videotaping of the statements.

Prior to trial, Tijerina's counsel moved to suppress the post-arrest statements. In the written submission, counsel argued, among other things, that Tijerina did not receive *Miranda* warnings; that, due to his physical, mental, educational, and psychological state and capacity, he could not appreciate and understand the full meaning of his *Miranda* rights; that Tijerina had asserted his right to remain silent and/or consult with an attorney prior to making the statements; and that the detectives obtained the statements using physical, psychological, and mental coercion. But at the hearing on the motion to suppress, Tijerina's counsel proceeded only on the

issue related to physical coercion, indicating that "ethically I'm only allowed to bring up those issues my client brings up, deal[ing] specifically with hitting in the face." Ex. N at O3.[2]

At the suppression hearing, Milz testified that after arresting Tijerina and taking him to the courthouse, the detectives advised Tijerina of his Miranda rights and placed him under arrest. Milz also testified that during a second conversation led by Longhitano, Longhitano again advised Tijerina of his Miranda rights, with Tijerina indicating he understood those rights. Milz testified that when he returned to Texas on June 17 with Longhitano and Detective Michael Mason, they again reintroduced themselves and advised Tijerina of his Miranda rights. He stated Tijerina indicated he understood his rights and agreed to provide another statement to the authorities. Milz testified that at no time did he or any of the others with him physically touch or otherwise coerce Tijerina into making a statement. After reviewing the video of the June 17 statement, the trial court denied Tijerina's motion to suppress, agreeing with the state that no force or threats were used against Tijerina to coerce the statements. The trial court further found that Tijerina was informed of his rights before making any statements.

## II. Tijerina's Trial and Conviction

Tijerina proceeded to a jury trial in Cook County, Illinois. The evidence at trial showed that Tijerina and Garcia shared an apartment on the second floor of a building in which much of his family lived. In the early morning hours of July 9, 2000, Teresa Morgan, who lived on the first floor of the building, heard a female voice, which she identified as Garcia's, screaming "stop hitting me" and then Morgan heard Tijerina yelling "bitch" and "whore" in Spanish. Ex. A at 2. Morgan also made out sounds of someone being hit. Hearing this, Morgan went down to the block to the pay phone to call the police. When the police arrived and knocked on Tijerina's door, Tijerina refused to open the door for Chicago police officer Hackett, who, hearing no

[2] All references are to exhibits filed by Respondent as the state court record at Doc. 44.

indications of a disturbance, left the scene. Officer Hackett also testified consistently about the response to the 911 call.

Several hours later, Tijerina woke up his sister Deana, who also lived in the building, to tell her something was wrong with Garcia. Deana testified that Tijerina told her that he had smacked and shaken Garcia because she was acting strangely and he wanted to know who gave her drugs. Tijerina claimed that Garcia fought back. Entering Tijerina's apartment, Deana found Garcia on the bed, purple and with her face swollen. She went with Tijerina to call 911 from the pay phone down the block, but after dialing 911, she turned around to find that Tijerina had disappeared.

The police officers who found Garcia's body noted that she had multiple abrasions on her face, her eyes were swollen shut, and blood covered her body and various items in the apartment. An autopsy identified bruises, cuts, and scrapes on Garcia's face, forehead, and arms, in addition to two bite marks on her arms. The autopsy also identified internal injuries, including bleeding into Garcia's eyes, three tongue bites, and bleeding under the scalp, over the brain, and under her skull, in addition to hemorrhages inside the back of her neck. The medical examiner concluded that Garcia died from strangulation and blunt force trauma, while her unborn child died from lack of oxygen.

The state played Tijerina's June 4 and June 17 videotaped statements for the jury. Additionally, Milz testified about the circumstances surrounding Tijerina's arrest and in obtaining the post-arrest statements. Milz testified that, on the day Tijerina was arrested, Detective Mason gave Tijerina *Miranda* warnings, using his Fraternal Order of Police handbook. After this, Tijerina admitted to knowing why he was arrested and agreed to speak with them. Milz related that Tijerina explained that on the night Garcia died, he awoke to find Garcia's eyes

appearing glassy, leading him to question her about taking drugs. After she denied taking drugs, Tijerina stated he slapped her numerous times but eventually fell back asleep, only to find Garcia dead when he woke up in the morning. Milz confronted Tijerina with the autopsy and medical examiner's reports, after which Tijerina expanded on his story, adding that he beat, bit, and choked Garcia as well. Milz testified that Tijerina repeated the story to Longhitano, after Longhitano again provided Tijerina with *Miranda* warnings, and did so again later that day for the videorecorded statement with the failed audio. Milz also testified about returning to Texas on June 17 to obtain Tijerina's second videotaped statement. Milz stated that, in the June 17 recorded statement, Tijerina repeated what he had said in the June 4 videotaped statement. Longhitano also testified. He echoed Milz as to the interviews on June 4 and June 17, including about advising Tijerina of his *Miranda* rights from memory on June 4.

Tijerina testified on his own behalf. He testified that he could not read or write. He denied Garcia was his girlfriend and that the unborn child was his, claiming instead that he took Garcia in when her mother, whom he had dated, abandoned her. He testified that, on July 9, 2000, when he woke up from a nap, he found Garcia unresponsive and so slapped her to get her to respond. According to Tijerina, this caused Garcia to headbutt him several times, knocking out his teeth. Around this time, he claimed the police arrived and that he told Garcia she could open the door if she wanted but that he never refused to open the door for the police. He further testified that he left the apartment after the police left and that when he returned, he found Garcia unresponsive. He denied knowing how Garcia sustained the wounds described by the medical examiner and portrayed in photographs, claiming she was not like that when he left her. Finally, he claimed that his June 2004 statements differed from his testimony at trial because he told the detectives and prosecutor what they wanted to hear in exchange for their promise to let him go.

During the state's rebuttal argument, the prosecutor accused Tijerina of pursuing "one diversionary tactic after another, trying to cast blame and point fingers at anybody and everything, anything and everything aside from him." Ex. S at V-60; *see also id.* at V-61 ("That's an attempt to create side issues. Diversionary tactics."); *id.* at V-86 ("I would ask you to remember the defendant's defense in this case, only a three day trial, his defense in this case has changed every day."). The prosecutor also accused Tijerina of lying, saying that "[t]o base any important decision on anything that [Tijerina] said while on trial in this case, a person would have to be a lunatic." *Id.* at V-66; *see also id.* ("How many different lies did he tell you yesterday?"); *id.* at V-66–73 (detailing the alleged lies Tijerina told); *id.* at V-68 ("And how many lies does someone have to tell you before you simply label them a liar and stop believing anything they tell you?"). In discussing the police response to the first 911 call to Tijerina's apartment, the prosecutor said that the jurors should not believe Tijerina's account because

> [w]hat [Tijerina's] asking you to believe then is that Officer Hackett is lying about that. Think about that for a second. How stupid did Officer Hackett make himself look by going to a door after a 911 call of a domestic disturbance and then when the male answers and tells them to got [sic] lost he doesn't do anything about it. He simply leaves. How stupid did Officer Hackett look for doing that. He's not lying about that. That's the way it happened. The defendant is lying about that."

*Id.* at V-71. With respect to the June 2004 statements, the prosecutor argued that the jury should believe Longhitano, the Assistant State's Attorney, over Tijerina, stating: "[Tijerina] wants you to believe the State's Attorney, a guy who apparently is going to just inexplicably take a chance and throw his license away and get this guy to simply say yes or no to whatever [questions Longhitano asked]. You want to believe that story?" *Id.* at V-81–82. In response to defense counsel's objections to these and other statements during the rebuttal argument, the trial court repeatedly instructed the jury that closing arguments were not evidence, that the jurors should

disregard any argument not based on the evidence, and that it was the jurors' duty to determine the credibility of the witnesses.

A jury convicted Tijerina of first degree murder and intentional homicide of an unborn child. The judge sentenced him to sixty years' imprisonment for first degree murder and forty years imprisonment' for intentional homicide of an unborn child, to run consecutively.

## III. Direct Appeal

With the assistance of counsel, Tijerina appealed to the Illinois Appellate Court. As relevant to the issues before the Court, Tijerina argued that the prosecutor's closing argument, particularly in rebuttal, deprived him of a right to a fair trial because the prosecutor called Tijerina a liar, accused defense counsel of using diversionary tactics, and bolstered the testimony of the state's witnesses. The Illinois Appellate Court affirmed Tijerina's conviction on March 31, 2008. With respect to the prosecutorial misconduct argument, the Appellate Court found that while the prosecutor "came dangerously close to tainting the trial, his arguments were not such error that reversal is required," finding instead that the prosecutor supported his arguments with evidence, highlighting inconsistencies among witnesses, and that the trial court properly instructed the jury that the prosecutor's argument was not evidence. Ex. A at 18. The Appellate Court acknowledged the prosecutor's error in arguing that Longhitano "would not lie because he was sworn to represent the people and there was no reason he would put his law license in jeopardy" but found that "it was not such an egregious error to deny defendant a fair trial." *Id.* at 19. Finally, the Appellate Court concluded that the comments about diversionary tactics did not constitute attacks directed at defense counsel themselves but rather at defense theories, removing the prosecutor's comments from consideration as being prejudicial.

Tijerina next filed a petition for leave to appeal ("PLA") in the Illinois Supreme Court, again raising the prosecutorial misconduct issue. The PLA was denied on September 24, 2008. Tijerina did not file a petition for a writ of certiorari with the United States Supreme Court.

**IV. State Post-Conviction Proceedings**

On January 23, 2009, Tijerina filed a *pro se* post-conviction petition pursuant to 725 Ill. Comp. Stat. § 5/122-1. As relevant here, Tijerina claimed that he received ineffective assistance of counsel because his trial counsel failed to investigate and file a motion to suppress based on the fact that the detectives and Longhitano continued to interrogate him in Texas after he invoked his Sixth Amendment right to counsel. Tijerina attached his own affidavit to the petition, in which he stated that he asked for an attorney on several occasions when he was arrested in June 2004 and was told that he would receive an attorney when he arrived in Chicago. The trial court dismissed Tijerina's petition as frivolous and without merit, finding that his trial counsel did file a motion to suppress, that Tijerina waived the argument that his statements should have been suppressed by not raising it on direct appeal, and that, regardless, testimony at the hearing on the motion to suppress established that Tijerina received *Miranda* warnings at least three times and never requested counsel. The Illinois Appellate Court affirmed the dismissal of Tijerina's post-conviction petition on January 26, 2011, disagreeing with the trial court's waiver finding but agreeing that the record refutes Tijerina's claim. The Illinois Supreme Court denied Tijerina's PLA on May 25, 2011.

Tijerina filed the instant petition for a writ of habeas corpus on January 13, 2014.[3]

[3] Respondent previously moved to dismiss Tijerina's motion as untimely. The Court ordered an evidentiary hearing to determine whether Tijerina was entitled to statutory or equitable tolling. *See* Doc. 12. Respondent subsequently withdrew its timeliness defense, allowing the Court to proceed to consideration of the merits of Tijerina's petition. *See* Doc. 34.

## LEGAL STANDARD

A habeas petitioner is entitled to a writ of habeas corpus if the challenged state court decision is either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court or if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Court]." *Williams v. Taylor*, 529 U.S. 362, 404–05, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). An "unreasonable application" of federal law occurs if the state court correctly identified the legal rule but unreasonably applied the controlling law to the facts of the case. *See id.* at 407. Whether a state court's application of Supreme Court precedent is unreasonable is judged by an objective standard. *Id.* at 409; *Winston v. Boatwright*, 649 F.3d 618, 624 (7th Cir. 2011).

## ANALYSIS

Tijerina raises two grounds for relief: (1) the prosecutor committed misconduct during closing arguments at trial, depriving Tijerina of a fair trial; and (2) Tijerina's counsel was ineffective in failing to advance an argument to suppress his post-arrest statements based on the fact that he had asked for a lawyer prior to giving the statements.

### I. Improper Statements in Closing Argument

Tijerina argues that certain statements made by the prosecutor during his rebuttal argument deprived Tijerina of a fair trial. Specifically, Tijerina takes issue with the prosecutor's repeated comments calling Tijerina a liar and the prosecutor's vouching for Officer Hackett and

Assistant State's Attorney Longhitano, arguing that when taken together with the prosecutor's comments about the defense's diversionary tactics, the statements prejudiced Tijerina.[4] On direct appeal, the Illinois Appellate Court rejected Tijerina's argument. The Appellate Court reasoned that the prosecutor's references to Tijerina as a liar were supported by evidence and thus constituted proper argument. Similarly, the court reasoned that the bolstering of Hackett's testimony was not improper because the prosecutor "did not argue that Hackett would not lie because he was a sworn police officer, but simply argued that it did not stand to reason that Hackett would make up a lie that made him look 'stupid.'" Ex. A at 19. The court did acknowledge that the prosecutor improperly bolstered Longhitano's testimony but concluded that comment did not deny Tijerina a fair trial. Similarly, the court found the prosecutor's comments about defense counsel undertaking diversionary tactics not to be prejudicial.

The parties agree that the analysis set forth in *Darden v. Wainwright*, 477 U.S. 168, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986), controls the Court's consideration of this claim.[5] Under *Darden*, a prosecutor's improper comments violate the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)). The Court first determines whether the challenged comments were improper, and, if so,

---

[4] In the reply prepared by appointed counsel, Tijerina does not appear to challenge the comments concerning the defense's diversionary tactics independently as improper. Any such challenge would be fruitless, for, as the Appellate Court found, a prosecutor can properly attack the theories of defense. *See, e.g., United States v. Bloom*, 846 F.3d 243, 254 (7th Cir. 2017) (not improper for government to criticize defense counsel's tactics).

[5] Although the Illinois Appellate Court did not specifically cite to *Darden*, that is not dispositive where the Appellate Court cited and applied Illinois law that tracks *Darden*. *See* 28 U.S.C. § 2254(d); *Mitchell v. Esparza*, 540 U.S. 12, 16, 124 S. Ct. 7, 157 L. Ed. 2d 263 (2003) ("[A] state court need not even be aware of [Supreme Court] precedents, so long as neither the reasoning nor the result of the state-court decision contradicts them." (citation omitted) (internal quotation marks omitted)); *Hough v. Anderson*, 272 F.3d 878, 903 (7th Cir. 2001) (finding state court's reasoning sufficient even though it "did not recite with precision the factors set forth in *Darden*").

considers whether Tijerina was prejudiced by those comments. *Bartlett v. Battaglia*, 453 F.3d 796, 800 (7th Cir. 2006). In determining prejudice, the Court considers: "(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant, and (6) the defendant's opportunity to rebut." *Howard v. Gramley*, 225 F.3d 784, 793 (7th Cir. 2000) (citing *Darden*, 477 U.S. at 181–82). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181 (citation omitted) (internal quotation marks omitted).

Although a prosecutor may not "imply[ ] that the jury should believe a witness based on evidence that was not presented to the jury," such as by arguing that another prosecutor should be believed because he would face career repercussions for providing false testimony, *Jordan v. Hepp*, 831 F.3d 837, 847 (7th Cir. 2016), a prosecutor may comment on a witness' credibility, including the defendant's, as long as the comments are based in evidence adduced at trial instead of personal opinion, *see Portuondo v. Agard*, 529 U.S. 61, 69, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000) (prosecutor could comment on defendant's credibility as a witness because "when a defendant takes the stand, 'his credibility may be impeached and his testimony assailed like that of any other witness'" (quoting *Brown v. United States*, 356 U.S. 148, 154, 78 S. Ct. 622, 2 L. Ed. 2d 589 (1958))); *London v. Clements*, 600 F. App'x 462, 467 (7th Cir. 2015) ("Inferences drawn from the evidence, including inferences about witness credibility, are fair game for closing argument."); *United States v. Catalfo*, 64 F.3d 1070, 1080 (7th Cir. 1995) ("Where the character and credibility of the defendant are at issue and the evidence allows the inference that the defendant has been less than truthful, the prosecutor does not err in closing argument by referring to the defendant as a liar."). A prosecutor may also "appeal to jurors' common sense"

when commenting on witnesses' credibility. *United States v. Alexander*, 741 F.3d 866, 871 (7th Cir. 2014). Here, the Appellate Court found that the prosecutor's references to Tijerina as a liar were supported by citations to the evidence, specifically the fact that his testimony at trial differed significantly from his account of the July 9 incident that he provided to the police and Longhitano in June 2004. The Appellate Court also noted inconsistencies the prosecutor highlighted between Tijerina's testimony at trial and the testimony of other witnesses that made Tijerina's testimony "incredible." Ex. A at 18. Tijerina does not argue that the prosecutor misstated the evidence in the rebuttal portion of the closing argument, nor could he. Because the prosecutors' comments about Tijerina's credibility were founded in the evidence and appealed to jurors' common sense, separately they were not improper. But Tijerina argues that the cumulative effect of the prosecutor's repeated references to him as a liar went too far and reached the point of excessiveness. *See Catalfo*, 64 F.3d at 1080 ("The prosecutor can go too far if her references to the defendant's veracity are intemperate and excessive[.]"). The Appellate Court did note that the prosecutor "should have resisted the temptation to utilize such extensive rhetoric in closing argument" and found the "rhetorical flourishes . . . unnecessary," but it also concluded that the arguments were founded in evidence and did not deprive Tijerina of a fair trial. Ex. A at 18; *see United States v. Washington*, 417 F.3d 780, 786–87 (7th Cir. 2005) (noting that prosecutor's comments that defense was "made up," "absolutely false," "ridiculous," or "ludicrous" all "could have been more artful" and some "pushed the bounds of zealous advocacy," but that the prosecutor could "emphatically rebut defense counsel's arguments" and "had legitimate grounds for some of his comments"). To the extent the Appellate Court should have found the prosecutor's comments concerning Tijerina as a liar improper, as discussed

below, the Court finds the Appellate Court appropriately concluded that his use of "such extensive rhetoric" did not deprive Tijerina of a fair trial. *See* Ex. A at 18.

Nor can the Court find that the Appellate Court erred concerning the prosecutor's remarks about Officer Hackett's testimony. The prosecutor contrasted Officer Hackett's story with Tijerina's, appealing to the jurors' common sense in arguing that Hackett's story was more believable because, "if [Hackett] were going to lie, he would have done so on a larger, more persuasive scale." *Alexander*, 741 F.3d at 870–71 (finding such a comment was not an improper comment based on a personal opinion or a reference to unadmitted evidence, in contrast to a statement that a police officer "would not violate his oath or break the law").

As the Appellate Court acknowledged, however, the prosecutor's remark concerning Longhitano was improper. *See Jordan*, 831 F.3d at 847. This requires the Court to consider the Appellate Court's determination that Tijerina did not suffer prejudice from the remark.[6] The record reflects that the trial court instructed the jury on numerous occasions that closing arguments are not evidence, that jurors should disregard arguments not based on evidence, and that the determination of the witnesses' credibility, including Tijerina's, was left to the jury. The prosecutor's remarks did not implicate any of Tijerina's constitutional rights. Additionally, Tijerina invited much of the prosecutor's rebuttal argument and the challenged comments by questioning the state's version of events and suggesting that his post-arrest statements had been coerced. Most importantly, the evidence weighed overwhelmingly against Tijerina, with

[6] Tijerina only argues that when the challenged statements are considered together, they amounted to improper statements that deprived him of a fair trial without discussing the factors considered by courts in determining whether the improper comments should be found prejudicial. Although the Court could find this to constitute waiver on the prejudice issue, *see United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)." (quoting *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000))), the Court nonetheless addresses the issue here.

numerous witnesses testifying against Tijerina and supporting the prosecutor's theory of the case. Tijerina's own statements, including his testimony at trial, suggested that he was responsible for Garcia's and her unborn child's death. Although Tijerina did not have an opportunity to respond to the prosecutor's statements because they were made in rebuttal, the other *Darden* factors all weigh in favor of finding that Tijerina was not prejudiced by any improper statements. Thus, to the extent the prosecutor's statements were improper, the Appellate Court reasonably found they did not deprive Tijerina of a fair trial. *See Parker v. Matthews*, 567 U.S. 37, 132 S. Ct. 2148, 2155, 183 L. Ed. 2d 32 (2012) (noting that "the *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations[.]'" (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004))). Thus, the Court denies Tijerina's petition with respect to this ground.

## II. Ineffective Assistance of Counsel

In order to establish constitutionally ineffective assistance of counsel, Tijerina must show (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In considering the first prong, the Court indulges "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and may not let hindsight interfere with its review of counsel's decisions. *Id.* at 689. For the second prong, a "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694. This means a "substantial," not just "conceivable," likelihood of a different outcome in the case. *Cullen v. Pinholster,* 563 U.S.

170, 189, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 112, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)). The Court need not address both prongs of the *Strickland* test if one provides the answer; that is, if the Court determines that the alleged deficiency did not prejudice Tijerina, it need not consider the first prong. *Ruhl v. Hardy*, 743 F.3d 1083, 1092 (7th Cir. 2014). In reviewing the Illinois Appellate Court's decision, the Court must apply a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, --- U.S. ----, 134 S. Ct. 10, 13, 187 L. Ed. 2d 348 (2013) (quoting *Cullen*, 563 U.S. at 190).

Tijerina claims that, at the suppression hearing, his counsel should have advanced the argument that he invoked his right to counsel prior to making his post-arrest statements and that, in failing to do so, counsel provided Tijerina with ineffective assistance of counsel. Tijerina contends that the Appellate Court, in considering this argument at the post-conviction stage, improperly found that Tijerina was advised of his *Miranda* rights and gave his statement of his own free will in a ruling that was contrary to and unreasonably applied clearly established federal law, namely *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), and *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981).

First, the Court disagrees with Tijerina that the Appellate Court's decision was contrary to clearly established law. *See Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (a state court decision is "contrary to" clearly established law if it "applies a rule different from the governing law set forth [by the Supreme Court], or if it decides a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts"). Here, the Appellate Court identified the controlling *Strickland* standard and then applied it throughout the decision, which is more than sufficient to demonstrate that the state court decision

was not contrary to *Strickland*. Although Tijerina claims that the Appellate Court should have also applied *Wiggins* and *Edwards*, these cases do not set forth the controlling standard for ineffective assistance claims nor do they set forth a decision on materially indistinguishable facts. *See Wiggins*, 539 U.S. at 527–28 (considering whether counsel provided ineffective assistance at sentencing phase by failing to investigate and present mitigating evidence of petitioner's dysfunctional background); *Edwards*, 451 U.S. at 484–85 (discussing invocation of counsel and waiver of that right).

Next, constrained by AEDPA's review standards, the Court cannot engage in the type of factfinding urged by Tijerina to find that counsel's performance fell below the acceptable standard. The Court must make its decision based on the record before the state court. *Cullen*, 563 U.S. at 181 ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). Although Tijerina submitted an affidavit with his post-conviction petition averring that he invoked his right to counsel prior to questioning, the Appellate Court rejected that affidavit, relying on testimony adduced at the suppression hearing and trial that "indicated that defendant was informed of his *Miranda* rights the three times he was questioned and gave his statement to the police and that he gave his statement on his own free will." Ex. G at 13. The Appellate Court further noted that although Tijerina's counsel initially made the invocation of counsel argument, she withdrew it in Tijerina's presence, "explain[ing] to the trial court that she could only ethically proceed on issues that defendant presented." *Id.* This led the Appellate Court to find that the record "firmly contradicts" Tijerina's claim of ineffective assistance. *Id.*; *see also id.* ("While [counsel] did not specifically say that defendant did not support the instant allegation, we do not find it as confusing a matter as defendant.").

Tijerina does not challenge the state court's factual findings and has not presented clear and convincing—much less any—evidence to rebut the presumption that the state court's factual determinations are correct. 28 U.S.C. § 2254(e)(1). The Court must then proceed to consider Tijerina's claim in light of state court's findings that Tijerina received his *Miranda* warnings and waived them in giving his post-arrest statements in June 2004. *See Henderson v. DeTella*, 97 F.3d 942, 946 (7th Cir. 1996) ("Whether a petitioner actually waived his *Miranda* rights, and whether he did so freely, knowingly, and intelligently, are fact-dependent issues that the state courts are best situated to resolve. . . . The state court's historical findings as to the petitioner's knowledge, understanding, and determination to forgo his *Miranda* rights are, consequently, entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1)." (citations omitted)).[7]

To prevail on his ineffective assistance claim, Tijerina would have to show that a motion to suppress based on the invocation of counsel would have succeeded. *See United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005) ("When the claim of ineffective assistance is based on counsel's failure to present a motion to suppress, we have required that a defendant prove the motion was meritorious."). But because the state court found that Tijerina received *Miranda* warnings and continued to provide his post-arrest statements freely, *i.e.*, without invoking his right to counsel, any motion to suppress on this basis would have failed. The Court's analysis can stop here, then, because the Appellate Court's rejection of Tijerina's

[7] Tijerina does not argue that his counsel should have asserted that he waived his *Miranda* rights involuntarily, which would involve a determination of whether his statement "was the product of fundamentally fair procedures, untainted by any type of coercion," and thus would constitute a legal question not entitled to the presumption of correctness. *See Henderson*, 97 F.3d at 947.

ineffective assistance claim as belied by the record did not amount to an unreasonable application of clearly established federal law.[8]

## III. Request for Additional Discovery and Evidentiary Hearing

As an alternative to the Court ruling on the merits on the record as it stands, Tijerina requests additional discovery on the ineffective assistance of counsel claim pursuant to Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts. He also requests an evidentiary hearing on his claims.

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997). Rule 6(a) allows a judge to authorize discovery "for good cause." *See* Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts. To be entitled to discovery, Tijerina must "(1) make a colorable claim showing that the underlying facts, if proven, constitute a constitutional violation; and (2) show 'good cause' for the discovery." *Henderson v. Walls*, 296 F.3d 541, 553 (7th Cir. 2002), *vacated on other grounds*, 537 U.S. 1230, 123 S. Ct. 1354 (Mem), 155 L. Ed. 2d 194 (2003). Good cause does

[8] Even assuming that counsel should have pursued the motion to suppress based on Tijerina's invocation of counsel and that it would have succeeded so that Tijerina's June 2004 statements would not have been introduced at trial, the Court would still deny Tijerina relief. Tijerina's statements in June 2004 were only a portion of the evidence offered by the state to support his conviction. The state also introduced Morgan's testimony that, from her apartment, she heard someone in Tijerina's apartment being hit while Garcia yelled "stop hitting me" and Tijerina called Garcia a "bitch" and a "whore." Ex. A at 2. Tijerina's sister, Deana, testified that Tijerina found her the morning of July 9 and admitted he smacked and shook Garcia several hours earlier and later found her unresponsive. Deana further testified that after the two went to call the police, Tijerina fled, only to be found four years later in Texas. Finally, the state introduced testimony about the immediate police investigation after Garcia's death and the medical examiner's findings, detailing the extent of Garcia's injuries and Garcia's and the unborn child's causes of death. Given this evidence, the Court cannot conclude that there is a reasonable probability that, had Tijerina's June 2004 statements been suppressed, the jury would have found Tijerina not guilty. Therefore, even if counsel's performance fell below an objective standard of reasonableness, the Court would not find prejudice. *See Avila v. Richardson*, --- F. App'x ----, 2016 WL 6999025 (Mem), at *2 (7th Cir. Nov. 30, 2016) (lawyer not ineffective for failing to file motion to suppress because "the case against [petitioner] did not depend on evidence derived from any arguable violation of his *Miranda* rights" and "even if a motion to suppress had been successful, 'the case was not going away'").


not exist "where the facts alleged do not provide a basis for relief." *Hubanks v. Frank*, 392 F.3d 926, 933 (7th Cir. 2004). Similarly, where the record precludes habeas relief, the Court need not hold an evidentiary hearing. *See Schriro*, 550 U.S. at 474; *Bland v. Hardy*, 672 F.3d 445, 450 (7th Cir. 2012).

Here, Tijerina has not presented a colorable claim for relief. He has not challenged the state court's factual findings nor argued that the state court made an unreasonable determination of the facts, instead only arguing that it unreasonably applied clearly established law to the facts. His allegations do not provide a basis to believe that discovery would change the Court's conclusions. Accordingly, the Court denies Tijerina's requests for discovery and an evidentiary hearing.

**CERTIFICATE OF APPEALABILITY**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the Court must issue or deny a certificate of appealability when it enters a final order adverse to a petitioner. A habeas petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (citing 28 U.S.C. § 2253(c)(2)). To make a substantial showing, the petitioner must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4, 103 S. Ct. 3383, 77 L. Ed. 2d 1090 (1983)). The requirement of a certificate of appealability is a threshold issue and a determination of whether one should issue neither requires nor permits full consideration of the factual and legal merits of the claims. "The

question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Miller-El*, 537 U.S. at 342.

For the reasons stated above, the Court finds no showing of a substantial constitutional question for appeal because reasonable jurists would not find this Court's rulings debatable. *See Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011) (citing *Slack*, 529 U.S. at 484–85). Accordingly, the Court declines to issue a certificate of appealability.

**CONCLUSION**

For the foregoing reasons, the Court denies Tijerina's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 and declines to certify any issues for appeal under 28 U.S.C. § 2253(c).

Dated: April 6, 2017

SARA L. ELLIS
United States District Judge